Good morning, Your Honors. May it please the Court, Cameron Jolly, Ford Defendants Jeff and Kathy Orr. I would like to reserve five minutes for Mr. Stephens, who represents the remaining appellants. Are you going to reserve rebuttal time, too, or are you going to go for a... Mr. Stephens will be rebutting. Okay. Thank you. Your Honor, the injunction that was issued in this case was simply unprecedented. There's not a California authority, there's not a federal authority, which says that a court can prevent a party from using their own company information that they develop. Their own information that they gather, there's not a single case. Instead, the cases are limited to injunctions which protect and are carefully limited and narrow to protect trade secrets. Your folks were independent contractors, is that right? Your Honor, yes. Not only were they independent contractors, my clients were told they're not Herbalife employees, they're not Herbalife representatives, they're not Herbalife agents, they're not Herbalife anything. That's an important fact. If they were employees, I suppose, if they were generating customers while working for a company, that might be a different story. Would you agree with that? Your Honor, that is what we call the sweat of the brow argument, and the answer is yes. If Herbalife were paying my clients to drive customers around and assuming the liability associated with a car crash... But they're paying them a salary to go drum up customers. That's right. The customers they drum up would belong to Herbalife. Yes, Your Honor. And if, of course, they took steps to protect it, but even then, the restraints that they're relying on in this case are much broader than necessary to, even in those employment cases, protect the trade secrets. Can I just get a clarification here, following up on Judge Silverman's comment? My understanding was, and I'd appreciate your clarification, that you are not contesting the viability of paragraphs one and two of the preliminary injunction. Is that correct? No, Your Honor. I apologize for any confusion in our brief. We are not contesting that my clients may be enjoined from, we're not arguing on an appeal that they should not be enjoined from using the four lists, the production override statements, the royalty list, and the biz works information. That was my point. The so-called confidential information as defined, you do agree that you are properly enjoined from using that information? Yes. My problem with the injunction at paragraph one is the judge broadened it by eliminating the word lineage reports to mean all information. And so... Well, he was simply taking the information from the, I guess it was the distribution agreement or something and quoting it exactly, was he not? He was, Your Honor. And then he, that agreement, the nondisclosure agreement that you're referring to, says that my clients can't use the information to solicit, can't use the information for any purpose. I understand that. But again, for a purpose, just so we know what it is we're wrestling with here. Yes. What is it specifically in paragraphs one and two, just those for the moment, of the injunction that you object to? All right. The trial court found specifically that the names of distributors was not a trade secret or verbalized. They publish it. Everybody puts it on the website. People say how much money they made. Okay. But what this says is all data and reports relating to a distributor's downline or upline distributors, including but not limited to name, address, et cetera, et cetera, but all of the information related to the upline and downline distributors. Do you disagree with that portion of the injunction? Yes, Your Honor. Because the Herbalife agreement that this was taken from said that it was carefully narrowed and tailored pursuant to the law. It said information provided by Herbalife. This injunction is so broad that it would include information, for example, if my client were to write down the name of his daughter that he sold an Herbalife nutty bar to, that would now become, that would now come under the blame of this injunction. Let's say he does that and there's information in the upline and downline list about just how much the daughter purchased and who her downline people were and how much they purchased and what their, what monies they received. Is that portion of it covered by the confidential information? Yes, Your Honor. That's also included. I'm not complaining. Whether or not it's the daughter. Yes, I'm not including the four lists, that my client couldn't look at the four, can't look at the four lists and say, this is the person I should go to. But the business card my clients collected, and if you've ever dealt with a multi-level marketing person, you know they're always grabbing your card, they're always calling you. That information they should be able to use. I guess what I'm struggling with here, counsel, is how do you separate, how do you separate the names, addresses, and so on from the up and down list from just those names in the abstract? It's not just the up and down list. It's a very specific report. That is the information that Herbalife contains. But it includes the names and addresses of these people, right? Absolutely. But if my client obtained those through a different source. Let's say that Auburn obtained them for the moment. Let's just say that it resulted entirely from the diligence of your clients. Yes, Your Honor. But it is included in these reports. It is an essential part of the reports, and what they got paid, and who owed what to whom is part of these reports. Are you saying that is not confidential information because your clients obtained it? Yes. Remember, the Uniform Trade Secrets Act says that Herbalife is the one that is supposed to have this information, and then this information is protected. But there is an exception in the Uniform Trade Secrets Act with respect to contractual agreements of the parties, is there not? Actually, Your Honor, I think that statement is broad. The way the law works when you come to covenants not to compete, because California's fundamental policy is we don't want restraints of trade. So any restraint of trade. The way the law works is even if you don't have these agreements, it doesn't matter. Because we're only going to enforce other rights that you would have had under the unfair competition laws. So these agreements don't give you more or less horsepower. And there's a federal case on point, the Hollingsworth case, where they say basically that the Ninth Circuit's view on a party's ability to restrain another from competing is as follows. And they say under applicable California law, the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the laws of unfair competition. So the Ninth Circuit is itself saying an unfair competition. So it would have to be a trade secret that is the subject of this injunction. Anything beyond a trade secret, like all of my clients' business cards that they collected on their own dime while driving. Let me ask for your guidance then. So you're aware I practiced commercial law in California for 37 years and dealt with this stuff all the time. So I have some background in it. And I'm looking now at 3426.7 that says this title, the Uniform Trade Secrets Act, does not affect, one, contractual remedies whether or not based upon misappropriation of a trade secret. Okay, so that's the Uniform Trade Secrets Act. Given what we were just talking about a minute ago, how, if in any way, does that impact the definition that the court included in paragraphs one and two of the injunction? All right. Contractual remedies, no problem. The problem is California's policy, which is stated in Business and Professions Code 16600. Every 16600 case deals with a contract. They just seem to. Every 16600 case strikes the language of the contract. It knocks down these restraints of trade because the language of 16600. Okay, but let's be clear about this. Yes, Your Honor. 16600 is a general section. Very few cases come out of that. It's all the subsections. 16601 dealing with partnerships and basically sales of business or corporations, sales of businesses, Goodwill and so on. You can enter into a covenant and compete on those because it says so. You've got comic books. You've got all these other kinds of things. And the Uniform Trade Secrets Act accepts out contractual remedies whether or not tied to trade secrets. So my question is, does that cover, does that exception cover what Herbalife tried to do in these contracts? I'm not saying they're well-drafted. I'm just saying the district court included language that came directly from that agreement. And what you seem to be saying is that 16600 basically wipes that away. And I'm looking for some authority that specifically states that a contractual agreement that is part of the, you know, has in mind the Uniform Trade Secrets Act, defines confidential information. It's mixed up. I agree with you. You've got names and addresses. But it also has all this distributor information. Why is that not protectable under California law? All right. I respectfully disagree with you, Judge. Good. Fine. I just want you to tell me why I'm wrong. And here's why. First, 16600 is one of the more highly litigated sections in my practice. Indeed. For 20 years I've been doing this area of the law. So when you look at the annotations, there are a ton of them. And all of those cases deal with contracts that restrain trade. Right. Some of them attempt to tie to trade secrets. Some of them don't attempt to tie to trade secrets. So what the court has enforced here is a part of the nondisclosure agreement, but he left out the part that said it had to be information which is in the contract itself. You can look at Supplemental Excerpt of Record 10. It says disclosed by Herbalife. And then the restriction on the use is merely you won't use it to solicit or for any other purpose. But confidential information is defined as the information disclosed by Herbalife. Where is that, please? For example, if we look at SCR 10. And what does that say, please? SCR, I'm going to look at, it's the same document, Excerpts of Record 76. It's the nondisclosure agreement. Okay. All right. And what language are you quoting there, please? It says in consideration of the disclosure to me at the very first sentence, an Herbalife independent distributor of confidential information of Herbalife International, I understand and agree that. So this is information that Herbalife is disclosing that is defined as confidential information. In fact, when you read further, they collectively define the data as lineage reports. Well, but it, I'm sorry. No, go ahead and answer Judge Smith's, or finish with Judge Smith, and then you want to reserve time for questions. Yeah, I was just going to say, yeah, I'm looking here at the second paragraph, and it has exactly the language of paragraph two, or one or two of the injunctions. It says all data and reports related to my downline and upline collectively lineage reports, including but not limited to name, address, identification number, telephone number, e-mail address, fax number, level or rank, volume and sales statistics, economic activities, and all data contained therein are confidential, proprietary secrets of Herbalife. Now, you've represented and did so to the district court as well, that the information about the name, address, phone number and so on came from your clients, right? And yet this says that it's confidential information. Is this not confidential information? What this says, in my reading of it, Your Honor, is in consideration of Herbalife disclosing this information to me. Herbalife couldn't possibly disclose to you the names and addresses that your clients are generating. So what I'm asking you to resolve for me, if you will, please, is how something can be defined as confidential, if it's enforceable, that was generated by your clients. It seems to me you've got a non sequitur here. Either it is or it isn't. If you're saying that the contract under 16-600 just is not enforceable, that confidential information as defined in this agreement can't possibly be enforceable, then I understand your argument. I may not agree with you, but I understand your argument. On the other hand, if you say my clients generated all these names, they busily collected all the cards and so on, and they hustled all these people to be sub-distributors, and notwithstanding that fact, I agree that once that information goes into Herbalife and we start attaching all this other data to them, then that's confidential information. Then that's another matter. Which is it? Your Honor, my position, by the way, just for the record, some of the information that comes on these lineage reports isn't generated by my clients. It's generated by the non sequitur. I understand that, but I'm saying some of it does, right? Yes, Your Honor. Okay. So you've got a merger, if you will, of these two different types of information. Yes, Your Honor. Are you saying that if they develop information on their own, getting the business cards and so forth, it doesn't morph into confidential information just because it winds up on the upline and downline report? Is that basically it? Yes, Your Honor. My reading of that agreement is if it's information disclosed by Herbalife to us in the form of those four lists, that's Herbalife's trade secrets. But if my clients went out and, for example, they're done. You hold it to Herbalife and then they put it on their reports, that's a different kettle of fish. But, of course, this injunction is not limited just to information they put on their reports. There's all business information that's prohibited by this injunction. Thanks very much, Mr. Johnson. Thank you, Your Honor. Mr. Patterson. May it please the Court. Charles Patterson for the appellee. Let me start out by saying that the real issue that we're talking about in this case is the scope of the injunction. And I think we've seen that at this point in time. The basis for this injunction, as it was set out by Judge Feist, was violations of trade secrets. And I'd like to answer first the question that has come up about where this information comes from. The information that Herbalife has as to names and addresses of each of these independent distributors comes from the distribution application, I'm sorry, distributor application that each of them sign and turn into Herbalife in order to become a distributor. They have an independent contract with Herbalife. They have no relationship in terms of contractual relationship with those who are above or below them on their up or down lines. So, just to be sure that we're all on the same page here, you've got distributor A. Distributor A gets B, C, D, and E to fill out a distributorship agreement by their own initiative. Those distributorship agreements come into Herbalife with their information, Herbalife then includes them in their database. Is that correct? That's correct, Your Honor. However, it does not follow that distributor number one in a line of, take for instance the Fords. Everyone that comes down below the Fords was brought into the organization by the Fords. It does not work that way. Well, it could be the C brought in D and the F brought in G and so on, right? Exactly. But the Fords benefit because of the payments from people below them on the down line, right? Precisely. And it's the context in which the names are put together by Herbalife into these reports that make the names a part of the confidential information. If Ford recruits Jones, can, under the indictment, Ford now contact Jones again? Ford can contact Jones, is my understanding. He can solicit Jones? Under this injunction that is here right now, they cannot solicit Jones for a period of one year after they have resigned their position. Okay. I don't understand why that's legal. That is legal, Your Honor, I think on the basis of the Lamb West cases. Lamb West, for instance, in which the court has discretion, as cited in our brief, in which the court has discretion to fashion an injunction which is broader than would ordinarily be done based upon trade secrets. What would be secret about Ford drumming up Jones on Ford's own time, Ford's own money? I'm sorry, Your Honor. I apologize. The situation here is like Lamb West. There is a head start. They have already, at the time we have gotten to them, contacted a number of these people using the confidential information. And using the confidential information. What confidential information would have been used? If Ford goes and knocks on Jones' door, what confidential information is used? Well, we have evidence that, for instance, Ford went and knocked on a door and used lineage information from lineage reports in order to say to people, let's start calling these people. They have information that tells you who's good and who isn't good, who's better, who's the best. How do you target what you're going to do? There is evidence that was before the court, not cited by the appellants, but before the court and in our statement of the record, that shows that they went in and solicited people using not only their own lineage reports, but using, admittedly, the lineage reports of other existing Herbalife distributors. Even if some of this can be enjoined, why would we enjoin or why is it proper for the injunction to cover such things as Ford knocking on his neighbor's door and saying, do you want to buy? I don't have any problem with Ford knocking on his neighbor's door or Ford keeping his daughter's address. But under your construct, he can't then solicit his neighbor again for a year. Not when that information has been, what he knows about the neighbor has been gained through the use of this confidential information. Well, he just gains it through his own initiative and hard work. He can't gain the information as to how much this person generates or how well this person is doing. That I understand. Otherwise than through these reports. No, but under the way the injunction is written, Ford cannot even go to his neighbor or if Ford goes to his neighbor and makes his neighbor a customer, he can no longer solicit the neighbor for another year. That strikes me as an overbroad injunction, even if these other things you're complaining about are valid. I understand that, Your Honor. All I can say is that here we have a record which shows that these appellants do not follow what they are instructed. Why shouldn't we ask the judge to go back and just tailor this injunction so that it covers your legitimate concerns but doesn't keep them from contacting customers that they drummed up on their own initiative? Actually, I think, Your Honor, at this point in time, it would be moot. The time has gone. The last of these distributors was terminated in March of 2007. So Paragraph 4 is really moot at this point? At this point in time, as I understand Paragraph 4 and read it, I believe, correctly, it is moot at this period of time. So where does that leave us? Paragraph 1, 2, and 3? That leaves you with the other paragraphs in the injunction, Your Honor, which we submit based upon a trade secret analysis and which the appellants do not object to the trade secret analysis. They have stated in their reply that if this case were just to enforce Herbalife's trade secrets, they would have no objection. I realize that we just talked about the one-year period and the mootness, but for our discussion purposes, the agreement to solicit looks remarkably like a covenant not to compete. Isn't that the real problem with 16,600, if you're not selling an ownership interest in a business? That is, if there is a problem with 16,600, I'm not sure which it is, the problem is not implicated in the determination of whether to uphold this injunction or not, simply because the court does not base its opinion and its injunction on a violation of the contract, but bases it upon a violation of the Trade Secret Act. I'm not sure you've answered my question. I'm sorry, Your Honor, maybe I haven't. Go ahead. But the bottom line is it's moot because of the one-year limitation. That is what it says. It says one year after they have resigned or terminated, and my information is the last one was terminated on, and that was Ms. Thompson in March of... How much of a bond did Herbalife post for this injunction? None, Your Honor. None? No. How can you have a preliminary injunction without a bond or an undertaking? It was not sought, and the court did not require one. Is it enforceable without a bond? I believe so, Your Honor, yes. Interesting. If we were to say that Paragraph 4 was overbroad at the time it was drafted, maybe the time has run out now, so maybe it's moot, as you suggest. The remaining, you know, go on record as saying Paragraph 4 was overbroad, but the remaining injunction was okay. What would your reaction to that be? Would you be off the deep end on that? My reaction, Your Honor, to that would be this is a preliminary injunction, and as such we are going to have the opportunity to try the case in its whole and obtain a permanent injunction if we can. And at that time, whether this is moot at this point in time or not, I don't think affects our chances at trial. I don't think it affects the law as it would be applied by the court in trial and in consideration of these issues. So you wouldn't be jumping up and down if we said Paragraph 4 was improper when issued, but the balance of the injunction is affirmed, something to that effect? I wouldn't jump up and down, Your Honor. I would disagree because I believe that the court has the discretion to do this in enforcing an injunction where it's faced with conduct that leads the court to believe that more has to be done with these defendants rather than or other than simply prohibiting them from using certain materials. Is it your or Herbalife's position that were plaintiffs to prevail, that in effect these multi-tier marketing organizations would meet their demise relatively quickly because if you can't enforce these, then it all crumbles? Where it hurts us is that we lose people all the time, people who find out that they can't sell, who join and think they're going to be able to sell things and just are not good at it. We lose them for a variety of reasons. They go back to full-time jobs. They do all these things. But the worst way to lose them is when you have someone who is good, who uses the product, who sells the product and is good at teaching other people to use the product and sell the product. And that person can be singled out by looking at these documents and you take them away. You take away, you ruin a whole down line. You ruin a whole organization. And if you do it with enough of those people, you do destroy the retail ability of the company to sell its product. Is there any analogy to this case? And forgive me, I don't remember the name of the case, but there was a raid in, if I recall, Sacramento by one brokerage firm, pretty much the entire staff of another brokerage firm in Sacramento, and that was enjoined and later on there were damages and so on. Is there any analogy between these cases where they can kind of cherry pick? Oh, exactly. That's what this information allows you to do is to cherry pick. It tells you who's, I was going to say naughty and nice, but it tells you who's nice and who's nicer. And you want the nicer or the nicest if you can get them. And does the record show that that's what they did? Yes, Your Honor. I think it does. I believe it does. The record shows that they used this information to say, for instance, to Mr. Schwammen, as is in here, to come in to him and say to Mr. Schwammen, you either come, we've already talked to your down line, they're going to come with us, you either come with us or we're going to take your down line and leave you with nothing. A method of coercing someone to get in there, that's all done by being able to know who his down line are, and that comes out of these reports. We think that the injunction, the trade secret analysis, we don't need to go through that because that has been already admitted by the defendants in this situation, that the court made a proper determination as to trade secret, that the injunction is proper in terms of there being serious questions with respect to the defendant's conduct and also that when you look at the balancing of the harm, the harm is primarily to Herbalife in this situation. They themselves have said in their briefs that we don't need this information, we don't have to have this information in order to compete with Herbalife. Fine, then don't use it and compete with Herbalife. The public interest, of course, here in the way that Judge Fease has approached this order is in protecting the trade secrets of Herbalife. Can I just ask one other clarifying question? Does it make any difference for purposes of our analysis that the plaintiffs are independent contractors as opposed to employees of Herbalife? No, Your Honor, I do not believe that it does. Is there any case law that would back that up? There is, and let me see if I can find that. We cited one in our brief that in response to that answer, that question rather. Can you just give me a cite to the page in the brief if you have it available? If I can find it here, Your Honor. If you can't find it, maybe just send us a 28-J letter. Reed v. Mass Company, is that the one? Reed v. Mass, yes. Reed v. Mass, okay. Doesn't that case involve an independent contractor? Yes, it does, Your Honor. And the other case, Scott v. Snelling, involves a franchisee? Yes, Your Honor, I believe so.  Thank you very much, Mr. Patterson. Thank you, Your Honor. For the ñ you fellows have used up your time, but we'll give you a minute and a half if you would keep it to that, please. Let me ask, I assume you're Mr. Stevens? Yes, John Stevens on behalf of six of the appellants. We said paragraph four shouldn't have been issued, but the rest of it is okay. What's your reaction to that? I would disagree with that primarily. Mr. Jolly has covered number one. But primarily because of paragraph three. Paragraph three covers contacts or business information, and I'm reading the last clause, acquired during the defendant's work with Herbalife that has resided in their contact database. If that were rewritten other than material that they generate themselves, that they generated themselves, would that solve the problem? That would go a long way towards solving the problem. Don't you run back into the same issue that I was discussing with your counterpart here, that the way this actually works is that your clients come up with this information. They then contact Herbalife. Herbalife sends out a distributorship agreement and the other packages. Then these folks fill it in, give them all this information directly. They send it in to Herbalife, and the contractual relationship is with Herbalife at that point. Your clients are, I don't know whether they're technically third-party beneficiaries or not, but in some way they get compensated. But the relationship thereafter is between these other people and Herbalife. We discussed with your colleague whether or not that can be a trade secret or, in this case, a contractually agreed trade secret. And I thought he said that, yeah, within limits it's probably okay, but we didn't finalize that. What's your take on that? I like the word that Judge Silverman used. If I could pay you a compliment after earlier today. This isn't guesswork up here, you know. We're finely tuned judicial machines. The word morph was, I think, perfect. So here's my position in a sense. If I'm a distributor and I go out and I cultivate a relationship with someone, I then take the contact information, I place it in my database, as Robert Ford testified that he's done 2,400 times. That information also goes to Herbalife. It comes back by way of a report with sales data. Then my point would be, okay, we can't use the sales data, but that doesn't mean that the relationship that we have with the person that we cultivated, and by the way, paid for the lead up to $5,000 a month to some other third party, could possibly be Herbalife's trade secret simply by virtue of the fact that we did those activities while we were working with Herbalife. Let's assume that of those 2,000 some odd names, that only 10 were really good. You could tell that by looking at Herbalife's information, and all you focused on was those 10. Would that be a problem? Yes, because we could quibble about whether the report is a trade secret, but that's not what our appeal does. The reality is your client generates those names, those 10 people. Before your client came along, Herbalife had no idea they even existed. You went through the process with them, they filed out the documentation, but it's through Herbalife's information that you know that they're really good, and you also know it because you're getting paid because of all the good work they're doing. Is that illegal? If we use the list to narrow the field, using the list, we shouldn't do that. If we have our own database apart from the list, and it happens to have some names that are also on the list, our view is the information on our own database is not Herbalife's trade secret. Stay away from the list. I'll tell you, in my opinion, our clients should take those lists and get rid of them. Focus on their own database that they've created through their hard work, through their effort, and their time and expense. And that's not a trade secret that can be restrained against. Thanks, Mr. Stevenson. Mr. Jolly, thank you. Mr. Patterson, thank you.
judges: Silverman, Rawlinson, Smith